IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DIANE PETRELLA, et al.,                    )
                                           )
                 Plaintiffs,               )
                                           )
        v.                                 )        Case No. 10-2661-JWL
                                           )
SAM BROWNBACK, Governor of Kansas,         )
in his official capacity, et al.,          )
                                           )
                 Defendants.               )
                                           )
_____)

## MEMORANDUM AND ORDER

This matter presently comes before the Court on the following motions: the State defendants' motion to dismiss (Doc. # 36); the Board defendants' motions to dismiss (Doc. ## 38, 88); the motion to dismiss or stay filed by the Board defendants and intervenors (Doc. # 90); plaintiffs' motion for preliminary injunction (Doc. # 28); and plaintiffs' motion for summary judgment (Doc. # 93). As more fully set forth below, the Court rules as follows: plaintiffs' motions for preliminary injunction and for summary judgment are **denied**; defendants' motions for a stay are **denied**; and defendants' motions to dismiss are **granted in part and denied in part**. Plaintiffs' due process claim and their claims based on an application of strict scrutiny or a denial of fundamental rights are dismissed, and defendants' motions to dismiss are granted to that extent; defendants' motions are otherwise denied.

## I.    **Background**

Plaintiffs are students and parents of students in the Shawnee Mission Unified

School District No. 512.  On December 10, 2010, plaintiffs filed this action against the

State defendants (the Governor, Attorney General, and Treasurer of the State of Kansas)

and the Board defendants (the Kansas Commissioner of Education and the members of

the Kansas State Board of Education).  By their complaint, pursuant to 42 U.S.C. § 1983,

plaintiffs claim that the Local Option Budget ("LOB") cap, found in K.S.A. § 72-

6433(b), which limits the funds that a school district may raise by local tax, violates the

Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to

the United States Constitution.  In addition to seeking declaratory relief, plaintiffs also

seek to enjoin the enforcement of the LOB cap.  Plaintiffs also filed a motion for a

preliminary injunction to the same effect.  The defendants filed motions to stay or to

dismiss the action on various grounds.[1]

By Memorandum and Order of March 11, 2011, the Court dismissed this action

on the basis that plaintiffs lacked Article III standing, for the particular reason that

plaintiff's alleged injury—the inability of the school district to raise additional funds

through a local tax—would not be redressed by a favorable decision because the LOB

cap is not severable from the state's statutory school funding scheme, striking down the

---

[1]After a hearing on January 18, 2011, the Court allowed a group of students and parents of students from a few other school districts to intervene as defendants in this action.

cap would mean invalidating the entire scheme, and the school district would thus have no authority to impose a tax. *See Petrella v. Brownback*, 2011 WL 884455 (D. Kan. Mar. 11, 2011). On October 18, 2012, the Tenth Circuit reversed that decision and remanded the case. *See Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012). The Tenth Circuit agreed with plaintiffs' argument—asserted for the first time on appeal—that their alleged injury was not the inability to raise funds through a tax but rather unequal treatment generally, which could be redressed, for instance, by invalidation of the entire funding scheme. *See id.* at 1295-96.

Upon remand, the Magistrate Judge conducted a scheduling conference and issued a scheduling order. The parties were ordered to file supplemental briefs in support of the pending motions to dismiss, motions to stay, and motion for preliminary injunction, and deadlines were set for those briefs and for any new motions. The Magistrate Judge also stayed discovery pending the resolution of a forthcoming motion for a stay of discovery. The Board defendants and intervenors subsequently filed additional motions to dismiss or to stay the case; the State defendants supplemented their motion to dismiss; and plaintiffs filed a motion for summary judgment. Plaintiffs did not supplement the briefing on their pending motion for preliminary injunction.

## II.    Dismissal and Summary Judgment Standards

The Court will dismiss a cause of action for failure to state a claim only when the factual allegations fail to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or when an issue of law is dispositive, *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The complaint need not contain detailed factual allegations, but a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. *See Bell Atlantic*, 550 U.S. at 555. The Court must accept the facts alleged in the complaint as true, even if doubtful in fact, *see id.*, and view all reasonable inferences from those facts in favor of the plaintiff, *see Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006). Viewed as such, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 550 U.S. at 555. The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th

4

Cir. 2006).

### III. Motions to Stay the Litigation

#### A. Pullman *Abstention*

Defendants argue that this Court should abstain from deciding this action or issue a stay pursuant to *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), pending resolution of the *Gannon* case presently on appeal to the Kansas Supreme Court. "Under *Pullman* abstention, a district court should abstain if three conditions are satisfied: (1) an uncertain issue of state law underlies the federal constitutional claim; (2) the state issues are amenable to interpretation and such an interpretation obviates the need for or substantially narrows the scope of the constitutional claim; and (3) an incorrect decision of state law by the district court would hinder important state law policies." *See Lehman v. City of Louisville*, 967 F.2d 1474, 1478 (10th Cir. 1992). In *Gannon*, the Kansas Supreme Court will likely rule on the constitutionality of the Kansas statutory school funding scheme, and defendants argue that that ruling will affect and may obviate the need for a ruling on the constitutionality of the LOB cap.

The Court rejects this request for *Pullman* abstention. First, the Tenth Circuit has noted the Supreme Court's preference for certification of questions over the use of *Pullman* abstention. *See Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1119 (10th Cir. 2008) (citing, *inter alia*, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997)). The doctrine is to be applied narrowly. *See Reetz v. Bozanich*, 397 U.S. 82, 86

(1970).  In this case, there is no unsettled question of state law that should first be addressed by the state courts.  Plaintiffs have disavowed any claim here that school funding is inadequate in violation of the Kansas Constitution, and they claim only that the LOB cap violates the federal Constitution.  The fact that a ruling in *Gannon* could potentially affect the LOB cap or this suit does not provide a basis for *Pullman* abstention.  Defendants' motions are denied with respect to this issue.

### *B.*    Colorado River *Abstention*

Similarly, the Court denies the Board defendants' motion for dismissal or a stay, in light of the pending *Gannon* case, based on *Colorado River* abstention.  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).  In *Colorado River*, the Supreme Court provided a basis for federal court abstention in deference to a parallel state court proceeding, based on factors such as the inconvenience of the federal forum, the desire to avoid piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums.  *See id.* at 818.  The balance of these factors is heavily weighted in favor of the exercise of federal jurisdiction, and "only the clearest of justifications will warrant dismissal." *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983) (quoting *Colorado River*, 424 U.S. at 818-19).  Although both this case and *Gannon* relate to the same statutory scheme, they are distinct, as the federal constitutionality of the specific statutory provision concerning the LOB cap—the narrow issue here—is not at issue in *Gannon*, and thus these cases are not actually parallel in the sense contemplated by this doctrine.  Accordingly, the

6

extraordinary circumstances needed for *Colorado River* abstention are not present here.

### C.   Inherent Power to Stay

The Board defendants also ask the Court to issue a stay pending resolution of *Gannon* pursuant to the Court's inherent power to control its docket, as recognized in *Landis v. North American Co.*, 299 U.S. 248 (1936).  In *Landis*, however, the Supreme Court emphasized that the party requesting the stay "must make out a clear case of hardship or inequity in being required to go forward," *see id.* at 255, and the Tenth Circuit has noted that, under *Landis*, a plaintiff's right to proceed "should not be denied except under the most extreme circumstances." *See Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983) (quoting *Klein v. Adams & Peck*, 436 F.2d 337, 339 (2d Cir. 1971)).  For the same reasons cited above, the Court declines to exercise its discretion to impose a stay here.

### D.   Comity

The State defendants also argue that the Court should dismiss this action under principles of comity pursuant to *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010). The Court rejects this argument as well.  *Levin* is clearly distinguishable, as that case turned on the Supreme Court's disfavor of the federal courts' interference with state taxation schemes.  *See id.*  Although a particular tax is at issue in this case, it is only a part of the school funding scheme, and the Court is not being asked to review an entire scheme of taxation.  Thus, the concerns present in *Levin* are not found here.

### E.   Ripeness

The Court also rejects the Board defendants' motion to dismiss this action for lack of ripeness. Defendants argue that because the status of the statutory school funding scheme is contingent on the outcome of the *Gannon* case, the operation of the LOB cap may not occur. As plaintiffs point out, however, the fact that the Kansas Supreme Court *may* declare the scheme unconstitutional as a whole does not make the present controversy unripe, and defendants have provided no authority to support its novel interpretation of the ripeness doctrine.

Defendants also suggest that, in light of the district court decision in *Gannon*, plaintiffs cannot show that any harm was caused by the LOB cap and not by inadequate funding generally. This is matter of proof, however, and the Court is not persuaded that the case's ripeness turns on such an issue of proof.[2]

## IV.   Proper Parties

The Board defendants argue that they are not proper defendants in this suit because they are not involved in enforcement of the LOB cap. In their opinion in this case, however, the Tenth Circuit held that these defendants were proper defendants in this type of suit. *See Petrella*, 697 F.3d at 1293-94. In their supplemental briefing, the Board defendants do not address that holding by the Tenth Circuit, but argue that the

---

[2]The Board defendants have requested that discovery be stayed until resolution of defendants' motions to dismiss and to stay. As the Court is presently resolving those motions, the request for a stay of discovery is denied as moot.

complaint does not state sufficient facts concerning their involvement in enforcement of the cap. In light of the Tenth Circuit's holding, however, the Court concludes that these defendants are proper parties to this suit and that plaintiffs' allegations are sufficient in that regard. This portion of the Board defendants' motion to dismiss is therefore denied.

## V. Merits-Based Motions

### A. *Law of the Case*

Defendants argue that plaintiffs' allegations are not sufficient to state plausible claims. Plaintiffs argue that the Tenth Circuit implicitly rejected that argument in its opinion in this case and that this Court therefore should not consider defendants' arguments under the "law of the case" doctrine. *See Copart, Inc. v. Administrative Review Bd.*, 495 F.3d 1197, 1201-02 (10th Cir. 2007) (under law of the case doctrine, issue may have been implicitly resolved in a prior appeal). The Court rejects this argument by plaintiffs. The Tenth Circuit did not offer any opinions concerning the sufficiency or plausibility of plaintiff's allegations or otherwise concerning the merits of plaintiffs' claims. The Tenth Circuit's opinion was limited to the issue of Article III standing; thus, consideration of the sufficiency of plaintiffs' allegations was not a necessary step in resolving the appeal, and the Court's consideration of those allegations now would not abrogate the Tenth Circuit's decision concerning standing. *See id.* (listing possible grounds for the conclusion that an issue was implicitly resolved in a prior appeal). Similarly, the Court does not agree that the Tenth Circuit's remand of the

case "for a consideration of the merits" was intended to foreclose valid challenges to the sufficiency of the complaint. Accordingly, the Court will consider defendants' assertions that plaintiffs have failed to state cognizable and plausible claims.

### B. *Infringement of a Fundamental Right*

With respect to the merits of plaintiff's equal protection claim, the first question is to determine the applicable level of scrutiny. Plaintiffs assert that the Court should apply a standard of strict scrutiny—that is, determining whether the statute is narrowly tailored to serve a compelling state interest—because the LOB cap operates as an infringement on their fundamental rights. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) (classifications affecting fundamental rights are given strict scrutiny). Plaintiffs' substantive due process claim also depends on the abridgement of a fundamental right. *See Washington v. Glucksberg*, 521 U.S. 702, 719 (1997) (Due Process Clause protects against government interference with certain fundamental rights and liberty interests). Plaintiffs allege the abridgement of three fundamental rights or liberties: (1) the right of parents to direct and participate in the upbringing and education of their children; (2) the right of parents and others in the school district to spend their own money on improved public education; and (3) the right under the First Amendment to assemble, associate, and petition for the advancement of the educational interests of their children through a popular vote on increased local taxes.

The Court rejects application of the strict scrutiny standard in this case. First, plaintiffs have not provided any authority declaring one of these interests to be a

fundamental right in this context of seeking the ability to conduct an election to approve the imposition of a tax. The Court will not declare a new fundamental right in the absence of such authority.

Moreover, the Supreme Court's discussion in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), concerning the proper level of scrutiny supports rejection of a strict scrutiny standard in this case. In *Rodriguez*, the Supreme Court rejected an equal protection challenge, under a rational basis review, to Texas's statutory school funding scheme that included reliance on local property taxation. *See id.* The Supreme Court concluded that although it had proclaimed the importance of public education in prior opinions, there is no fundamental right to public education under the United States Constitution. *See id.* at 29-39.

Plaintiffs suggest that *Rodriguez* does not necessarily control here because they have argued for slightly different fundamental rights. In *Rodriguez*, however, the Court also noted that a less-stringent test was appropriate because the attack was on the way in which Texas raised and disbursed state and local tax revenues, which meant that the Court was being asked to intrude in an area in which the Court has traditionally deferred to state legislatures. *See id.* at 40-44. The Court noted that it had "often admonished against such interferences with the State's fiscal policies under the Equal Protection Clause." *See id.* at 40. The Court further stated: "In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal

Protection Clause." *See id.* at 41. Thus, the Supreme Court has counseled against using strict scrutiny in this area of public school funding, in which the federal courts lack the expertise and familiarity with the issues possessed by the state legislature.

An examination of each of the particular interests asserted by plaintiffs also supports rejection of the strict scrutiny standard in favor of the rational basis test. First, plaintiffs claim that strict scrutiny is warranted here by the infringement of their fundamental right as parents to direct and participate in the upbringing and education of their children. In support of this argument, plaintiffs have cited various instances in which the Supreme Court has noted the fundamental right of parents concerning the care, custody, and control of their children. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66 (2000). More specifically, the Supreme Court has noted its recognition of a fundamental liberty interest "to direct the education and upbringing of one's children." *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)). The cases cited by plaintiffs concerning education, however, are easily distinguished. *Meyer* concerned the violation of a statute forbidding the teaching of a foreign language prior to graduation from eighth grade. *See Meyer*, 262 U.S. 390. *Pierce* concerned the violation of a statute requiring education at public schools instead of private schools. *See Pierce*, 268 U.S. 510. *Wisconsin v. Yoder*, 406 U.S. 205 (1972), concerned a statutory requirement to attend school until age 16. *See id*. In none of those cases did the Supreme Court recognize a parent's fundamental right to control *all* aspects of public education. *See*

*Swanson ex rel. Swanson v. Guthrie Independent Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998) ("parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject"). In particular, the Court has not recognized the right of parents to control how a State funds public education, including the right to attempt to compel a vote seeking to authorize a local tax to force others (as well as themselves) to use their money to fund public education. Such a broadly ranging right may not be inferred from a more specific fundamental right relating to parents' ability to have their children learn a particular subject or to choose to have them educated in a private school or at home.

In addition, this right to control one's child's education must be considered in the context of the Supreme Court's holding that there is no fundamental right to public education. Thus, in the present case, plaintiffs are not so much trying to retain the right to decide how to educate their children, as much as they are trying to assert a right to more and better-funded public education. That claim treads closer to *Rodriguez*, in which the strict scrutiny standard was rejected, than to the right to control education, and the Court therefore rejects this basis for application of strict scrutiny here.

Second, plaintiffs argue in favor of parents' fundamental right to spend their own money on their children's education. In support of such a right, plaintiffs cite only a statement in a concurring opinion in *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494 (1977), a case concerning a single-family zoning requirement, in which Justice Stevens noted the long-recognized common-law "basic right" of an owner "to decide

best how to use his own property." *See id.* at 513 (Stevens, J., concurring). Justice Stevens, however, did not recognize or cite authority for a fundamental right, for purposes of a claim under the Equal Protection Clause or the Due Process Clause, to spend money however one wishes, without limits. Thus, this Court will not create a hitherto unrecognzied unlimited fundamental right to spend one's money on education without restriction. Certainly, plaintiffs have not provided any authority recognizing a specific right to attempt to compel a vote seeking to authorize a local tax to fund public education. Moreover, plaintiffs seek to spend not only their own money, but that of their neighbors in the school district as well, and plaintiffs have not cited any support for a fundamental right to spend others' money on their children's education.

Further, even if such a fundamental right to spend one's own money on education did exist, the LOB cap does not abridge that right. Plaintiffs are not being prevented from using their money to fund their children's education, as they can send their children to private schools or donate their money to the local school district. Plaintiffs respond that it is absurd to talk about private donations, which cannot possibly be expected to provide the needed revenue. The unlikelihood that plaintiffs will effect change by giving their own money, however, does not bear on the question of whether plaintiffs' right to spend their money (assuming there is such a right) is being abridged here. Plaintiffs are not being prevented from giving as much as they wish to their school district or otherwise in furtherance of their children's education; therefore, there is no abridgement of the right asserted by plaintiffs here.

14

Third, plaintiffs assert the abridgement of fundamental rights under the First Amendment, including the right to associate and to petition the government. Plaintiffs cite *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290 (1981). In that case, the Court held that a statute's limit on campaign contributions to committees concerning ballot measures, as opposed to contributions to individuals, limited speech and violated the First Amendment's right of association. *See id.* That case is clearly distinguishable, however, as the statute at issue limited the exercise of an existing ballot measure provision. In the present case, plaintiffs are essentially arguing in favor of a fundamental right to associate to pursue a particular voter initiative in a manner not presently authorized under Kansas law (i.e., approving a tax in excess of the statutory cap). The Tenth Circuit, however, has explicitly rejected the concept of a fundamental right to pursue a voter initiative. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210-11 (10th Cir. 2002) ("[N]othing in the language of the Constitution commands direct democracy, and we are aware of no authority supporting this argument. In fact, every decision of which we are aware has held that initiatives are state-created rights and are therefore not guaranteed by the U.S. Constitution."). Otherwise, plaintiffs' right to associate has not been abridged, as they are free to join together, for instance, to petition the Kansas Legislature to repeal the LOB cap. Thus, the *Citizens* case does not support heightened scrutiny here.

Plaintiffs also argue that the LOB cap infringes their right under the First Amendment to seek better education for their children. As noted above, however, the

Supreme Court has concluded that there is no fundamental right to public education. Plaintiff cite *Papasan v. Allain*, 478 U.S. 265 (1986), in which the Supreme Court noted that *Rodriguez* had not completely foreclosed the possibility of applying strict scrutiny, based on an argument that some minimal amount of education is necessary to the meaningful exercise of the right to exercise free speech or to vote, in an instance of a "radical denial of educational opportunity." *See id.* at 284. In *Papasan*, as in *Rodriguez*, however, rational basis scrutiny was appropriate because there were no allegations that such a minimally adequate education had been denied, such that students could not read or write, or were not given basic instruction. *See id.* at 285-87. In attempting to invoke this possible exception noted in *Rodriguez* and *Papasan*, plaintiffs argue that the Kansas Supreme Court has held in the past that previous school funding schemes did not provide for adequate public education, in violation of the Kansas Constitution. Plaintiff also cite to statistics placing the funding for their school district in the lower portion of rankings of districts in Kansas. Plaintiffs, however, have not made any showing—or even alleged in their complaint—that the statutory funding scheme in general and the LOB cap in particular cause children in Kansas or in their district to be so under-educated to constitute a "radical denial of educational opportunity" as necessary to the meaningful exercise of the right to free speech. In short, the Court is not persuaded that this case should be treated differently from *Rodriguez* and *Papasan*, in which rational basis review was deemed appropriate.

In summary, plaintiffs have not provided authority for the recognition of a

fundamental right in this context of seeking the ability to approve a tax, and this Court will not recognize such a right for the first time in this case, particularly in light of the Supreme Court's application of a rational-basis standard in *Rodriguez* and *Papasan*. Accordingly, plaintiffs cannot maintain their claim for a violation of substantive due process, and defendants' motions to dismiss are granted to that extent. Similarly, because the Court concludes that plaintiffs' equal protection claim must be considered under a rational basis standard, defendants are entitled to dismissal of plaintiffs' equal protection claim to the extent that it is asserted under the strict scrutiny standard. Correspondingly, plaintiffs' motion for summary judgment is denied with respect to those claims.

C.    <u>Equal Protection Claim – Rational Basis Review</u>

Because heightened scrutiny is not appropriate, the Court reviews the LOB cap under the rational basis standard, which requires only that the means be rationally related to a conceivable and legitimate state end. *See, e.g.*, *Nguyen v. INS*, 533 U.S. 53, 77 (2001). "The fact that other means are better suited to the achievement of governmental ends therefore is of no moment under rational basis review." *Id.* The Supreme Court has described this inquiry as follows:

> Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. Where there

> are plausible reasons for Congress' action, our inquiry is at an end. This standard of review is a paradigm of judicial restraint. The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.

*See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313-14 (1993) (internal quotations and citations omitted).

Plaintiffs have moved for summary judgment in their favor on their equal protection claim. Because the Court concludes that plaintiffs have not established a violation of equal protection as a matter of law at this stage, as explained below, the Court denies their motion for summary judgment. At the same time, the Court declines the State defendants' invitation to award defendants summary judgment on this claim despite the absence of any motion by defendants pursuant to Fed. R. Civ. P. 56. In ruling on plaintiffs' motion, the Court is obliged to draw all inferences in defendants' favor, and thus it assumes for purposes of that motion that the Kansas Legislature enacted the LOB cap in furtherance of the interests asserted by defendants. That same inference may not be drawn in considering judgment in defendants' favor, however, and defendants have not yet provided record evidence establishing as a matter of uncontroverted fact that the Legislature in fact acted in furtherance of those interests (and not for some improper discriminatory purpose, for instance). For that reason, the Court will not enter judgment in defendants' favor at this time. Moreover, for that same reason, and because plaintiffs have adequately pleaded a violation of the Equal Protection Clause by alleging

that the Legislature acted without a rational basis, the Court denies defendants' motions to dismiss for failure to state a claim as they relate to this particular claim.

The Court first considers the most relevant Supreme Court cases, the import of which the parties dispute. In *Rodriguez*, as noted above, the Supreme Court rejected an equal protection challenge, under a rational basis review, to Texas's statutory school funding scheme that included reliance on local property taxation. *See Rodriguez*, 411 U.S. 1. In a footnote in that opinion, the Supreme Court noted the dissenting opinion's reference to the statutory funding scheme's cap on the local school district tax, and it concluded that the constitutionality of that cap was not before the Court "and must await litigation in a case in which it is properly presented." *See id.* at 50 n.107. The Court then included a "Cf." cite to the case of *Hargrave v. Kirk*, 313 F. Supp. 944 (M.D. Fla. 1970), *vacated sub. nom Askew v. Hargrave*, 401 U.S. 476 (1971). In *Hargrave*, the district court concluded that a cap similar to the LOB cap violated the Equal Protection Clause. Plaintiffs argue that the Supreme Court effectively endorsed the district court's ruling in *Hargrave* by its citation to that opinion. The Court flatly rejects that argument. In *Rodriguez*, the Supreme Court expressly refused to address the issue of a cap's constitutionality. Moreover, the Court also cited its vacating of the district court's opinion in *Hargrave*. *See Rodriguez*, 411 U.S. at 50 n.107. Finally, in the course of vacating that opinion, the Supreme Court commented that the district court improperly decided the issue only on the basis of the pleadings and an affidavit that merely verified those pleadings. *See Askew*, 401 U.S. at 478-79. Thus, there is no basis to infer that the

Supreme Court effectively endorsed the ruling of the *Hargrave* district court by its citation to that case in a footnote in *Rodriguez*.

In fact, consideration of the Supreme Court's opinion in *Rodriguez* seems to weigh against plaintiffs' claim here. In that case, the Supreme Court noted that the Texas system, like almost every state's, was intended to create a statewide system of funding public education while continuing an element of local participation and control. *See Rodriguez*, 411 U.S. at 47-49. The Court noted that some resulting disparity was not sufficient to make the scheme unconstitutional; nor should the scheme be condemned just because it was imperfect or other methods would have been better. *See id.* at 50-51. The Court stressed that the Texas system was not the result of hurried, ill-conceived legislation, and was not intended to discriminate against any particular class. *See id.* at 55. The Court stated:

> We are unwilling to assume for ourselves a level of wisdom superior to that of legislators, scholars, and educational authorities in 50 States, especially where the alternatives proposed are only recently conceived and nowhere yet tested. The constitutional standard under the Equal Protection Clause is whether the challenged state action rationally furthers a legitimate state purpose or interest. We hold that the Texas plan abundantly satisfies this standard.

*See id.* (citation omitted). As a "cautionary postscript," the Court noted that a contrary result would have caused a great upheaval in public education, that there is nothing certain in trying to predict the outcome of employing a different scheme, and that such considerations highlight the "wisdom of the traditional limitations" on the Court's function. *See id.* at 56-58. Thus, in *Rodriguez* the Supreme Court stressed the

importance of the federal courts' deference to the judgment of legislators regarding public school funding. The need for such deference undermines plaintiffs' claim seeking to invalidate as irrational one provision of the comprehensive statutory school funding scheme enacted by the Kansas Legislature.

After *Rodriguez*, the Supreme Court again considered the constitutionality of a school funding scheme in *Papasan*. In *Papasan*, the district court dismissed the claims at the pleading stage as barred by the Eleventh Amendment, and the Fifth Circuit agreed with that ruling and also ruled that dismissal was proper because the scheme was not unconstitutional under *Rodriguez*. *See Papasan*, 478 U.S. at 275. The Supreme Court reversed, holding that the equal protection claim was not barred by the Eleventh Amendment and that *Rodriguez* did not require dismissal of that claim at the pleading stage. *See id.* at 276-92. The Court distinguished *Rodriguez* as follows:

> [A]s to this claim, we are unpersuaded that *Rodriguez* resolves the equal protection question in favor of the State. The allegations of the complaint are that the State is distributing the income from [certain lands] unequally among the school districts, to the detriment of [certain schools] and their students. . . . This case is therefore very different from *Roriguez*, where the differential financing available to school districts was traceable to school district funds available from local real estate taxation, not to a state decision to divide state resources unequally among school districts. The rationality of the disparity in *Rodriguez*, therefore, which rested on the fact that funding disparities based on differing local wealth were a necessary adjunct of allowing meaningful local control over school funding, does not settle the constitutionality of disparities alleged in this case . . . .

*See id.* at 287-88. Based on that reasoning, plaintiffs argue that its claim is more like the one in *Papasan* than the one in *Rodriguez* because the disparity from which they allege

21

harm resulted not from the differing local wealth but from the State's affirmative decision to limit additional local funding by imposition of the LOB cap.

Plaintiffs' comparison of this case to *Papasan*, however, is not completely apt, as the State has not decided in this case simply to allocate different amounts of money to different school districts. The challenged LOB cap does not represent a state-created disparity, as discussed in *Papasan*; rather, it represents an attempt to *limit* the disparity that may result from an unlimited ability of school districts to provide additional funding. Thus, the Court does not agree that this case is more akin to *Papasan* than to *Rodriguez*.

Moreover, even if this case were similar to *Papasan*, that case would not compel judgment in plaintiffs' favor at this stage. In *Papasan*, the Court did not hold that the statute was unconstitutional; rather, the Court, after distinguishing *Rodriguez*, remanded the case for litigation of the equal protection claim under the rational basis standard. *See id.* at 292. In the present case, then, if *Rodriguez* does not require a ruling in defendants' favor, it at least compels further litigation of the claim, as in *Papasan*. The Supreme Court's decision in *Papasan* certainly does not provide a basis for finding a constitutional violation as a matter of law at this stage.

Plaintiffs argue that equity—the attempt here to limit the amounts that richer school districts can raise from the LOB, and thus limit the resulting disparity among districts that could occur without a cap—is not a legitimate governmental interest. Plaintiffs argue that a disparity in favor of richer districts would be constitutionally permitted under *Rodriguez*, and that therefore the State is not required to try to address

that disparity by limiting the cap.

Plaintiffs also point to the Kansas Supreme Court's decisions in the *Montoy* case. In *Montoy II*, the supreme court held that the statutory school funding scheme in effect at that time failed to comply with the Kansas Constitution's requirement that the Legislature "make suitable provision for finance" of public schools. *See Montoy v. State (Montoy II)*, 278 Kan. 769 (2005). The court stated that the "equity with which the funds are distributed" was a critical factor for the Legislature to consider in providing suitable funding. *See id.* at 775. In *Montoy III*, the supreme court held that new legislation enacted in response to *Montoy II* was not sufficient. *See Montoy v. State (Montoy III)*, 279 Kan. 817 (2005). The court noted in that opinion that the Legislature's increase in the LOB cap exacerbated wealth-based disparities between school districts. *See id.* at 834. Finally, in *Montoy IV*, the supreme court held that new legislation was sufficient to satisfy the requirements of the Kansas Constitution. *See Montoy v. State (Montoy IV)*, 282 Kan. 9 (2006). In that opinion, the court noted that the Kansas Legislature had responded to its concerns about "wealth-based disparities inherent in the LOB" by adjusting a component of that provision. *See id.* at 23.

Plaintiffs argue that, in the *Montoy* cases, the supreme court did not necessarily require equity in all situations, but that any equity considerations related only to the achievement of suitability under the Kansas Constitution. Thus, plaintiffs appear to argue that equity is not required if suitability is already achieved, and that therefore equity is not a legitimate interest here.

This analysis by plaintiffs is not sound. Even if plaintiffs were correct that the State was not *required* to seek equity among school districts in order to be constitutional, either under *Rodriguez* or the *Montoy* cases, that does not mean that pursuing equity is not a legitimate governmental interest as a matter of policy. Notably, plaintiffs have not cited any cases, or offered any persuasive reasoning, to support the argument that equity is not a legitimate governmental interest with respect to funding public education.[3] Plaintiffs argue that one may not seek to achieve equity at the sake of violating the Equal Protection Clause of the United States Constitution, or by discriminating against a class such as wealthier school districts. It is elemental, however, that the Equal Protection Clause does not forbid all discrimination or unequal treatment, but only forbids unequal treatment that does not pass the rational basis test (in the absence of a fundamental right). Thus, a state *may*, under the Equal Protection Clause, discriminate against wealthier districts if the measure is rationally related to a legitimate purpose. Moreover, as defendants note, the pursuit of a claim under the Equal Protection Clause based on the argument that equity is not a legitimate governmental interest seems inherently unsupportable.

In addition, plaintiffs' argument concerning the *Montoy* cases appears at least a

---

[3]Plaintiffs argue that the LOB cap serves only to disadvantage school districts that wish to spend more money on schools, and they state that the Supreme Court has repeatedly rejected such "disadvantaging" justifications as illegitimate. In support of that statement, however, plaintiffs cite only cases that involve the fundamental right of free speech under the First Amendment, which cases are therefore easily distinguished from the present case.

little disingenuous in light of the complaint's allegation that suitability has *not* been achieved in Kansas. Furthermore, at the time that the LOB cap was enacted in its present form, the Legislature was attempting to address the Kansas Supreme Court's holding that funding was not suitable. In *Montoy IV*, the supreme court noted the change in the LOB and cap provisions and held that the legislature had adequately addressed the problem of the local wealth disparity. Thus, the court effectively required the Kansas Legislature to consider equity with respect to the LOB cap in order to achieve compliance with the Kansas Constitution. In *Papasan*, the United States Supreme Court stated that if the state's action was dictated by a requirement of federal law—if the state effectively "had no choice in the matter"—that requirement would provide a rational reason for the funding disparity there. *See Papasan*, 478 U.S. at 289. Similarly here, the Kansas Supreme Court's dictates to the Kansas Legislature to consider equity with respect to LOB cap in order to ensure compliance with the Kansas Constitution would provide a rational basis for the Legislature's subsequent legislation.

Plaintiffs also contend that the LOB cap fails the rational basis test because it does not serve equity but actually harms equity, in the sense that their school district receives lower funding than other districts and cannot supplement that funding through an unlimited LOB to catch up. Thus, plaintiffs argue that educational quality is harmed, based on their allegations that quality is tied to funding and that their school district has had to close schools and increase class sizes. Plaintiffs further argue that the LOB cap does not promote equity because there is no reason to believe that wealth-based

disparities would occur without the cap. Plaintiffs argue that any such effect is pure speculation, particularly with respect to arguments that wealthier districts would be able to hire the best teachers by offering more money. Plaintiffs note defendants' statement that, if there were no cap and wealthier districts raised more money, the State would be required to pay out more supplemental aid to the other districts; thus, plaintiffs argue that no disparity would occur.

These arguments are not persuasive. First, any such factual disputes concerning plaintiffs' actual harms and the causes therefor preclude summary judgment in plaintiffs' favor. Moreover, defendants argue that the harm plaintiffs allege (less money, closing of schools) is not caused by the LOB cap, which is applied in the same manner to all school districts, but rather that any disparity in funding results from the entire scheme—attacks on which plaintiffs have consistently disclaimed in this Court, in the course of its "surgical" attack on the LOB cap. Finally, these arguments by plaintiffs fail to address the governing principle of law, set forth above, that a measure may be reasonably related to achieving the legitimate interest even if it does not succeed or provide the best method for achieving it. Plaintiffs essentially argue that the State did not choose the best way to achieve equity, but that fact (even if true) does not mean that equal protection has been violated. In summary, plaintiffs have not shown that equity in school funding is not a legitimate state interest or that the LOB cap is not rationally related to that interest.

Defendants also point to the State's legitimate governmental interest in limiting

property tax rates. *See Lynch v. State of Alabama*, No. 08-S-450-NE, 2011 U.S. Dist. LEXIS 155012, at *1184-85 (N.D. Ala. Nov. 7, 2011) (cap on property taxes for funding school districts rationally related to legitimate governmental interest in maintaining lower property tax rates). Plaintiffs distinguish *Lynch* on the basis that the present case involves a *desired* tax increase, which would be approved by the voters and thus would represent taxation *with* representation. Of course, any LOB tax is also imposed on those who have voted against the tax, and the Kansas Legislature—a representative body—would have a legitimate interest in limiting taxes imposed on its citizens for economic reasons. Plaintiffs have not shown that the LOB cap could not be rationally related to such a legitimate interest.

Accordingly, plaintiffs have not established a violation of equal protection under the rational basis test as a matter of law. The Court therefore denies plaintiffs' motion for summary judgment.

## VI.    Preliminary Injunction

In the early stages of this action, plaintiffs filed a motion for a preliminary injunction barring enforcement of the LOB cap. Although the Court took evidence and conducted a hearing on that motion, its dismissal of the case for lack of standing prevented it from reaching the merits of the preliminary injunction motion. Upon remand from the Tenth Circuit, plaintiffs have not submitted supplemental briefing or otherwise sought to obtain a ruling on that motion. Nevertheless, because plaintiffs have

not withdrawn the motion, it remains pending, and the Court will address it here.

"Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013). If a movant can show that the last three requirements "tip strongly" in its favor, the movant may meet the first requirement regarding success on the merits "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation." *See Oklahoma ex rel. Okla. Tax Comm'n v. International Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006).

The Court concludes that plaintiffs have failed to satisfy this test for a preliminary injunction. First, the Court concludes that plaintiffs have not shown a likelihood of success on the merits of their equal protection claim. For the reasons set forth by the Court in denying plaintiffs' motion for summary judgment, plaintiffs are not likely to succeed in showing that the LOB cap is not rationally related to the pursuit of a legitimate state interest in maintaining equity among school districts with respect to resources.

Moreover, plaintiffs are not entitled to a relaxed standard for showing likelihood of success on the merits because the other requirements for a preliminary injunction do not weigh strongly in plaintiffs' favor. Specifically, the Court concludes that plaintiffs

cannot show that their alleged harm in being subject to the LOB cap outweighs the harm to the State and to the public from an injunction against enforcement of the cap. The Court has previously analyzed the issue and concluded that the LOB cap is not severable from the rest of the statutory school funding scheme under Kansas law.[4] Thus, because the school funding scheme may not be applied without the LOB cap, the injunction sought by plaintiffs would also completely upend the entire system of public education in Kansas. Such a result would work a tremendous hardship on public-school students and the rest of the public throughout Kansas, and that potential hardship easily outweighs plaintiffs' alleged harm from continued enforcement of the LOB cap pending the outcome of this litigation. Accordingly, the Court denies plaintiffs' motion for a preliminary injunction.

IT IS THEREFORE ORDERED BY THE COURT THAT the State defendants' motion to dismiss (Doc. # 36) and the Board defendants' motions to dismiss (Doc. ## 38, 88) are **granted in part and denied in part**. Plaintiffs' due process claim and their

---

[4]In reversing this Court's dismissal of the case for lack of standing, the Tenth Circuit stated that because plaintiffs' alleged injury went beyond the inability to hold an election to approve a local tax and included having to suffer discrimination in violation of the Constitution (an argument raised for the first time on appeal), this Court's consideration of the severability issue was premature. *See Petrella*, 697 F.3d at 1296. The severability issue *is* relevant, however, to plaintiffs' pending motion for a preliminary injunction, as it bears on the potential harm suffered by the State and the public if enforcement of the LOB cap is enjoined. Accordingly, the Court must resolve the issue at this time, and it reaffirms its prior ruling that the cap is not severable. *See Petrella*, 2011 WL 884455, at *3-6.

claims based on an application of strict scrutiny or a denial of fundamental rights are dismissed, and defendants' motions to dismiss are granted to that extent; defendants' motions are otherwise denied.

IT IS FURTHER ORDERED BY THE COURT THAT the motion to dismiss or stay filed by the Board defendants and intervenors (Doc. # 90) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' motion for summary judgment (Doc. # 93) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' motion for preliminary injunction (Doc. # 28) is **denied**.

IT IS SO ORDERED.

Dated this 29th day of October, 2013, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge